## Henry Harms and The Home National Bank v. Charles R. Frost et al.

1. VENDOR'S LIEN—*General Principles.*—Whether a vendor's lien will be enforced in any given case depends so entirely upon the facts involved that no general rule can be laid down that can cover every kind of a case. As between vendor and vendee alone, a lien will be sustained: but as between that lien and a mortgage lien, the latter is generally preferred.

2. SAME—*Liens Accruing at the Same Time.*—Of two liens accruing at the same time, the legal lien of a recorded mortgage must be deemed superior to the secret equity of a vendor.

3. SAME—*Failure to Give Notice of.*—A vendor of real estate, who allows third parties to spend their money in improving it, under the provisions of a mortgage made to them by the vendee, without making any protest or claim of a vendor's lien, will not be allowed to set up a claim to a lien as against such parties.

4. DEEDS—*Pass Title When Delivered.*—A deed, without being recorded, if delivered to the grantee, or some one for him, passes title as effectually as though it were recorded.

Harms v. Frost.

**Bill,** to foreclose trust deed.  Appeal from the Circuit Court of Knox County; the Hon. John J. Glenn, Judge, presiding.  Heard in this court at the May term, 1896.  Reversed and remanded with directions.

## Statement of the Case.

This was a bill in equity commenced by the appellees, Charles R. Frost, Robert W. Frost, John W. Frost and Edward J. Frost, comprising the firm of Robert Frost's Sons, and Samuel L. Charles, to foreclose a certain trust deed executed by the Galesburg, Etherly & Eastern Railroad Company, dated the 5th day of May, 1894, and recorded in the recorder's office of Knox county May 7, 1894, and executed to the Royal Trust Company to secure the payment of $120,900 of first mortgage bonds of $500 each as hereinafter mentioned, of which appellants, Robert Frost's Sons, claimed to own $40,000 worth, or eighty bonds, and appellant Harms $60,000, and the Home National Bank of Chicago, Ill., $20,000, and a claim by appellee for money furnished for right of way and expenses incurred by them.  We adopt the following statement prepared by appellant's counsel :

The Galesburg, Etherly & Eastern Railroad Company was incorporated April 7, 1894, under an act of the General Assembly of the State of Illinois relative to corporations in force July 1, 1891, and was so incorporated for the purpose of constructing and operating a railroad from Wataga, in Knox county, Illinois, beginning at a point north of the depot of the Chicago, Burlington & Quincy Railroad, in said Wataga, and running in an easterly direction to the coal lands of the Galesburg Coal Company in said Knox county, and to and through a town site to be located in the immediate vicinity of the said Galesburg Coal Company's lands, to be named " Etherly."  The capital stock of said railroad company was divided into fifteen hundred shares of one hundred dollars each, or $150,000.

On the 24th day of April, 1894, a contract was entered into by the said Galesburg Coal Company, party of the first part, the Brown & Windsor Construction Company, party of

the second part, and W. H. Bates, Samuel L. Charles and Robert Frost's Sons, party of the third part.

Under this agreement and in consideration of the agreements of the parties of the first and third parts, the party of the second part undertook and agreed to construct the Galesburg, Etherly & Eastern Railroad, erect depots, purchase a locomotive and such other equipments as might be necessary. The party of the third part agreed to furnish a sum of money necessary to purchase the right of way, and where right of way could not be purchased, the same to be procured by condemnation proceedings, and paid for by the said third party, title to rest in the railroad company. Third party also agreed to guarantee the contract of second party with the Illinois Steel Company for the purchase of all rails to be used in the construction of said railroad in a sum not exceeding $30,000. The Brown & Windsor Construction Company, the second party therein, was to deliver to the said W. H. Bates, Samuel L. Charles and Robert Frost's Sons, the party of the third part, the first mortgage bcn ls of said railroad company at seventy-five cents on the dollar in an amount equal to the sum expended for right of way and the amount guaranteed the Illinois Steel Company for rails; also as collateral, the entire stock of the railroad company. The Brown & Windsor Construction Company by this contract agreed to protect and save harmless the third party thereto in its said guaranty to the Illinois Steel Company for rails not exceeding $30,000, and to meet and discharge its obligations on or before maturity, and failing so to do, the rights of the second party under said contract to be forfeited to third party thereto.

Upon the performance of the covenants on the part of the second party, the first party, the Galesburg Coal Company, agreed to deliver to the Brown & Windsor Construction Company thirty-five hundred shares of full paid non-assessable stock of the said Galesburg Coal Company, and when the notes given for rails were discharged, the third party agreed to release the railroad stock held as collateral (except that part thereof held as security for money advanced

Harms v. Frost.

to pay for right of way, which was not to be released unless such money should be repaid within a reasonable time), of which entire stock the third party was to own thirteen-twentieths, and the second party seven-twentieths. Said agreement further provided that any unsold railway bonds or proceeds thereof not used in the construction and equipment of the road at date of its completion should revert to the treasury of the said railroad company. Said agreement further provided that a town site company should be formed to promote a town on the lands of third party, the location to be agreed upon, which lands were to be sold to such town site company at not more than $60 per acre, and in this town site the party of the second part should have a four-tenths interest.

On May 4, 1894, Henry Harms and J. S. Spikings entered into an agreement in the nature of a sub-contract with the Brown & Windsor Construction Company, in and by which contract the said Harms and Spikings agreed to build the Galesburg, Etherly & Eastern Railroad between the points designated in the articles of incorporation, and to furnish the material and do the work necessary in its construction; the Brown & Windsor Construction Company to furnish steel fastenings and locomotive and construction cars free of charge, to be operated by Harms and Spikings. For such construction the Brown & Windsor Construction Company agreed to pay to Harms and Spikings $45,000, to be evidenced by the collateral notes of the Construction company, to be secured by $60,000 of the first mortgage bonds of the Galesburg, Etherly & Eastern Railroad Company to be held as collateral. Some of which note and bonds were to be delivered as the work progressed, the balance to be delivered when the road was completed. Harms succeeded to all the rights and interests Spikings had under said contract.

By trust deed of May 5, 1894, and recorded May 7, 1894, in the recorder's office of Knox county, Illinois, the Galesburg, Etherly & Eastern Railroad Company conveyed to the Royal Trust Company, all and singular its railway and

railways, with the road-bed, grades, right of way, bridges, depots, grounds, fixtures, and all its property of every kind and nature, acquired or which might thereafter be acquired, in its name or in its behalf, including all its franchises, privileges, net income and revenue which might arise from the use and operation of said railroad. Said trust deed recited that the said railroad company had already commenced the construction of the railroad, and was desirous of borrowing money to complete and equip the same, and to carry out a resolution passed by the board of directors thereof, and approved by the stockholders, had determined to issue the bonds, to be designated first mortgage bonds, in an amount not exceeding one hundred and twenty thousand dollars, and that, in order to carry out the resolution of said company and to secure said bonds, the president and secretary were authorized to execute a trust deed to the Royal Trust Company. The said trust deed further recited that the said issue of bonds and the execution of said trust deed were authorized by resolution of the board of directors of the railroad company, unanimously passed.

The bonds secured by said trust deed were two hundred and forty in number, each for the sum of $500, and due on July 1, 1914. The semi-annual interest upon said bonds, until maturity, at 6 per cent per annum, were evidenced by coupons attached thereto. Each of said bonds recited that "the payment of which is secured by a mortgage of even date herewith, giving a first lien upon the railway franchises and equipment described therein, made by said railroad company to the Royal Trust Company, of Chicago, as trustee, and duly recorded."

On June 6, 1894, an agreement, supplemental to the one of April 24, 1894, was made, which, after reciting the provisions of the said former agreement, stated that the Brown & Windsor Construction Company did thereby deposit, deliver and assign to W. H. Bates, S. L. Charles and Robert Frost's Sons, $40,000 face value of the first mortgage, twenty-year, six per cent gold bonds, of said railroad company. Said agreement further provided " that, in the future, and as soon

as it can be done," there should also be deposited with and assigned and delivered to W. H. Bates, S. L. Charles and Robert Frost's Sons an additional amount of first mortgage twenty-year, six per cent gold bonds of said railroad company, sufficient, at seventy-five cents on the dollar, of the face or par value thereof, to equal the money paid out for right of way. Although this agreement was signed only by the Construction company, it was recognized by the parties to the first agreement, and under it the appellees obtained title to the bonds they owned. The sale of collateral under notice, introduced in evidence, was made under and by virtue of the authority given appellees and W. H. Bates therein.

Under these several contracts and agreements the railroad was built. Henry Harms took from the Brown & Windsor Construction Company their notes for work done and material used in its construction. He also took the one hundred and twenty mortgage bonds as collateral to these notes, and after default had been made in the payment of the notes, he became the owner of said one hundred and twenty bonds, absolutely. The Home National Bank, of Chicago, loaned money to the Brown & Windsor Construction Company, and took the notes of said Construction company for such loans, and, as collateral, took the forty bonds owned and controlled by it as security for said notes.

By the bill of appellees, and the answer of appellants, Harms and the Home National Bank, foreclosure of mortgage securing the mortgage bonds is prayed, and decree of foreclosure rendered therefor. In addition to the foreclosure upon the bonds held by them, appellee also claimed a first lien upon the right of way and road-bed of the mortgaged premises, on account of advances made by them for the purchase of the right of way, as will be seen hereafter.

As between the appellant Harms and appellees, in so far as the bonds and their relative rights and liens thereunder are concerned, no question is made in this case. Plaintiff below, and appellees here, secured their bonds, eighty in number, in effect in consideration of money advanced to-

ward the construction of the road. Defendant below, and appellant here, Harms, secured his bonds, one hundred and twenty in number, in effect in consideration of work and labor also entering into the construction of the road. Thus far the equities of the parties are equal.

By the terms of the contract, as seen above, between the Brown & Windsor Construction Company and appellees, the latter were to guarantee the notes of the Construction company on account of steel rails to the extent of $30,000, and, in fact, subsequently paid this amount on such guaranty. Appellees, under the contract, were also to advance the necessary amount of money to secure the right of way for the railroad. For these advances, so to be made, appellees were to receive as collateral security enough of the mortgage bonds of the railroad company, held by the Construction company, at the rate of seventy-five cents on the dollar, as would equal the sum expended for rails and right of way; and were also to receive as additional collateral security the entire stock of the railroad company, amounting to $150,000.

By the subsequent agreement between the Construction company and appellant Harms, the latter agreed to furnish the material and the labor for the construction of the railroad, at an agreed price, to be secured by the mortgage bonds of the railroad company, amounting in the aggregate to $60,000, as collateral. These bonds were subsequently delivered to appellant Harms, pursuant to the agreement, and became his absolutely by collateral sale thereof.

By the subsequent and supplemental agreement between the Construction company and appellees $40,000 of the mortgage bonds and $149,500 of the railroad stock were then delivered to appellees in pursuance of the terms of the original contract, and at the time of such delivery it was further agreed " that in the future, and as soon as it can be done," there was also to be delivered to appellees an additional amount of the mortgage bonds, sufficient at seventy-five cents on the dollar to equal the money paid out on right of way account, as security for the faithful performance of the

Harms v. Frost.

agreements embraced in the original and supplemental contracts of the Construction company with appellees. This supplemental contract also empowered appellees to sell the securities on the default of the Construction company; and a default having occurred, this was done.

The decree finds that appellees have paid out for right of way and expenses, the sum of $15,351.36, and that they should have had under the terms of the contracts, original and supplemental, $20,468.40 of the first mortgage bonds, and in equity are deemed to have received that quantity of the bonds; and not having in fact received them, the defendant Harms, with the Home National Bank, must prorate with plaintiffs their proportionate share of this amount, from the proceeds of sale of the mortgage property.

The bill in this case, so far as the right of way advancements are concerned, is based upon the supposed fact that plaintiffs have a first lien upon the right of way and roadbed situated thereon, which was part and parcel of the mortgaged premises, for such advancements made, though the prayer is for a first lien upon the entire mortgage premises.

The decree of the lower court, however, instead of giving the complainants a first lien upon the right of way and road-bed, in effect increases the mortgage indebtedness by the sum of $20,468.40, and gives the appellees a lien therefor co-equal with the original and actual mortgage debt, upon all the property of all kinds covered by the mortgage, so that appellees, instead of getting a first lien upon a specific portion of the mortgaged property contributed by them, as claimed in their bill, get a joint lien with the holders of the other mortgage indebtedness on the entire property.

KNICKERBOCKER & SMITH, attorneys for appellant, Henry Harms.

WINSTON & MEAGHER, attorneys for appellant, The Home National Bank; FLETCHER CARNEY and SILAS H. STRAWN, of counsel.

J. M. RIGGS, attorney for appellees.

MR. JUSTICE LACEY DELIVERED THE OPINION OF THE COURT.

The main controversy in this case arises over that por-
tion of the decree of foreclosure of the Circuit Court which
provided that out of the proceeds of the sale of the mort-
gaged premises the master should pay a *pro rata* sum of
$20,468.40 in equitable consideration of the fact that
appellees were entitled to that many bonds of the railroad
company, under the contract of April 24, 1894, and supple-
mental contract, June 8, 1894, with the Brown & Windsor
Construction Company for procuring the right of way,
and expenses incurred therein; that the said sum should pro-
rate with the authorized issue of bonds to the amount of
$120,000, the same as though the first named sum had been
an additional issue, and held by the appellees, thus in effect
scaling down the amount that would be otherwise paid to the
holders of the bonds actually issued in case the sale failed
to produce enough to pay the entire amount foreclosed in
this suit to the extent of the *pro rata* per cent of the claim
for right of way and right of way expenses.

It is insisted on the part of the appellees that the decree
can be sustained upon the ground that they had a vendor's
lien on the right of way to the amount of its cost, and the
expenses incurred and paid by appellees, and although the
basis of the decree was not on that theory, yet the amount
they would receive would be less than they were entitled
to on the proper basis.

We need not stop to inquire whether this position is
based on proper grounds, as it will not be involved in the
consideration of the case. We shall treat the claim as the
bill did, as being one for a vendor's lien on the right of way.
It appears from the abstract of the various right of way
deeds that they were all procured by appellees and exe-
cuted to the Galesburg, Etherly & Eastern Railroad Com-
pany, between and including the dates of April 26, 1894 and
August 18, 1894, except one deed dated June 1, 1895, and of
the consideration of $135. Something over two-thirds of the

entire amount of $15,351.80 was paid out, and the deeds procured prior to June 6, 1894, and the balance after that date.

The deeds in question were not handed over to the railroad company as they were obtained, but were retained by the appellees and were produced at the hearing and were ordered by the court in its decree to be turned over.

The building of the railroad by Harms was commenced immediately after the date of his contract of May 4, 1894, and completed October 27, 1894, and the bonds delivered to him in accordance with his contract as collateral security.

The bonds held by appellee have been sold and bought in by them under the provisions of their contract, and the Home National Bank and Henry Harms are the owners of the bonds not held by appellees. The Home National Bank became the owner of its forty bonds for money advanced to the Brown & Windsor Construction Company.

The lien claimed by appellee is not a lien by virtue of anything contained in the tripartite contract between them and the Galesburg Coal Company and the Brown & Windsor Construction Company, or the supplement thereto, but if a lien at all, is one created by the equitable principles of the law. It is not a statutory lien under any provision of the statute.

Under certain circumstances a vendor's lien is created as between the vendor of real estate and the vendee where no intervening interests come in.

It is not a lien very much favored by law but is often enforced in equity. Whether or not such a lien will be enforced in any given case, depends so entirely upon the facts involved that no general rule can be very well laid down that will cover every kind of a case. As between vendor and vendee alone there can be no question but that a lien would be sustained, but as between that lien and a mortgage lien the latter is generally preferred.

In the case of Fisk v. Potter, 2 Abb. App. Dec. 138, it is laid down as a general rule, that where two liens accrue at the same instant of time, and it becomes a question which of the two has superiority (the one a constructive one only

arising out of a secret trust by operation of law or based upon the ground of its being a natural equity connected with the consideration of the property purchased, the other arising from a specific legal lien based upon written contract and matter of public record), the preference will be given to the latter. The facts in the latter quoted cases are not precisely as they are in this case, but the principle above announced we regard as sound. In Bagley v. Greenleaf, 7th Wheaton, 46, Justice Marshall lays down the following rule: " A vendor relying upon this lien ought to reduce it to a mortgage so as to give notice to the world. If he does not, he is, in some degree, accessory to the fraud committed on the public by an act which exhibits the vendee as the complete owner of an estate upon which he claims a secret lien. It would seem inconsistent with the principles of equity and with the general spirit of our laws that such a lien should be set up in a court of chancery to the exclusion of *bona fide* creditors."

The Supreme and Federal Courts of the United States hold a mortgage lien good as against equitable liens in favor of the claimants for claims for original construction, rails, frogs, etc., rental of leased lines, claims for rolling stock, salaries of officers, lost goods and sureties on appeal bonds.

Liens are sometimes allowed for wages performed for the railroad in producing its income, or " going expenses," as it is sometimes called.

We think all the circumstances show that they did not intend, when they entered into the contract of April 24, 1894, to retain a vendor's lien on the right of way which they undertook to procure for the railroad company, and the outside circumstances and relationship of all the parties but strengthens this supposition.

The appellees were owners of the entire stock in the Galesburg Coal Company as appears from the evidence of R. W. Frost, who testifies that on April 24, 1894, Robert Frost's Sons, S. L. Charles and W. H. Bates were the owners and holders of the capital stock of the Galesburg Coal Co., of Galesburg, Ill., that is, it was held by different members

of the firm, not as a firm, but it was held by six individuals, four of whom composed the firm, and those were the Frosts who succeed to the rights of Charles and Bates.

There was also another project on hand and that was to lay out a town site on the lands owned by the Frosts which they were to sell by the terms of the contract, or a portion of it, at $60 per acre to the Brown & Windsor Construction Company, which company was to have a four-tenths interest therein.

It was therefore a great personal interest, or supposed to be, to Frosts, appellees, to have the railroad built as projected, otherwise the coal mine could not be developed nor the town built.

The contract of April 24, 1894, signed by the appellees as the party of the third part, as also the contract to appellant Harms and Spikings, were both entered into and signed prior to the issuing of the first mortgage bonds in question; but, no doubt, under the circumstances, all parties knew what bonds were to be issued because the bonds were provided for in the two contracts, and it must have been known that they were to be issued, otherwise they would not have been mentioned.

Under the contract signed by appellees the Brown & Windsor Construction Company agreed to construct the railroad and depots and purchase a locomotive and such other equipment as might be necessary, and the appellees and Bates and Charles, whose rights they have succeeded to, agreed to furnish the money necessary to purchase the right of way and condemn it where it could not be purchased, and the title to the right of way was to rest in the railroad company, and to guarantee the contract of the Brown & Windsor Construction Company with the Illinois Steel Company for the purchase of the rails to be used in the construction of the railroad, not to exceed $30,000; and was to receive and did receive eighty of the bonds and the entire stock of the railroad company.

The right of way and steel rails were thus only provided for, and all the balance of the expenses and costs of building

the railroad must be furnished by the Construction company.

And how was the Construction company to procure the money and build· the balance of the road? Manifestly, it must be out of money procured by the sale of the railroad bonds, which must have been contemplated would come into its hands from the railroad company, and which did actually come into its hands, as shown by the subsequent contracts and proceedings.

These appellees must have understood this, as it is a legitimate conclusion from all the evidence and from a consideration of the various contracts. Appellees agreed with the Construction company to furnish the money and to procure the right of way, and take bonds as collateral security at seventy-five cents on the dollar, and there was no provision in the contract that they were to retain a lien of any kind.

Appellees, no doubt, perfectly understood that the railroad company must have the right of way clear before it could issue any bonds that would be salable, and must have known that these bonds would be put on the market for sale, and that the purchasers would expect to get a clear title to the railroad right of way and franchise for their security; therefore they were, no doubt, willing to accept the responsibility of the Construction company under their contract for their reimbursement for the money to be furnished for the right of way.

The Construction company and the railroad company were separate and distinct organizations, and as to the contract in question between appellees and the Construction company, the railroad company had no privity, so far as the evidence discloses.

We must suppose, however, that the Construction company received some consideration for its undertaking to furnish the railroad company with the right of way, and that was, no doubt, the secret of its agreement with appellees to furnish the right of way to the railroad company, and the railroad company was required to do nothing.

It did, however, issue the bonds contemplated, mortgaging the right of way secured and to be secured.

Harms v. Frost.

Under these circumstances, whenever the deeds were made out and executed by the owners of the land for the right of way, and paid for by the appellees, being in the name of the railroad company as grantee, the contract was contemplated and the title vested in the railroad company, the transaction amounted to a delivery of the deeds to it, and the mortgage immediately attached free of any incumbrance of a vendor's lien. And the retention of the right of way deeds, on the part of appellees, without any authority by their contract so to do, made no difference as between them and the railroad company and the mortgage bondholders, and no record of the deeds was necessary to pass the title.

A deed without being recorded, if delivered to the grantee or some one for him, passes the title as effectually as though it were recorded. The appellees were the mere agents of the Construction company by virtue of their contract with it to procure the conveyances of the right of way to the railroad company, and having accomplished that, the title passed free of any vendor's lien.

The appellees knew very well that the mortgage would attach to the right of way as soon as the deeds were executed and that the railroad company was under no obligation to fulfill the contract of the construction company.

By the terms of the contract, and especially the supplemental contract of June 5, 1894, it was not contemplated that the railroad bonds should be delivered to the appellees to secure them in the advancement of the right of way money upon the procurement of the right of way deeds, because the supplemental contract provided that "in the future and as soon as it can be done," there should also be deposited with and assigned and delivered to appellees an additional amount of the said railroad bonds sufficient, at seventy-five cents on the dollar of their face value, to equal the money paid out for the right of way.

It will be seen that at this time over two-thirds in value of the deeds for the right of way had been procured, placing the title thereof in the railroad company, and afterward,

knowing that the Construction company could not then deliver the bonds according to the contract as originally made, procured the balance of the right of way at a cost of over. $5,000.

The procuring of the deeds and the delivery of the contemplated railroad bonds, were not required to be a contemporaneous act, and the non-delivery of the bonds was not to delay the procurement of the deeds.

It is insisted by counsel for appellees that the words "as soon as it can be done," referring to the delivery of the bonds, meant as soon as the total amount of right of way could be ascertained.

We do not think this is a fair construction of the clause. It is broader. It refers to any cause of delay, and a significant fact is that after delivering the eighty bonds to appellees, the Construction company had hypothecated, by contract or otherwise, all the remaining issue to appellant Harms and Spikings, and the Home National Bank.

We think it is a fair inference that appellees knew that fact and were willing to wait for their redemption by the Construction company so that they could be delivered.

We do not think, however, that this is a vital point in appellant's case.

In addition to those facts and circumstances, Harms and the railroad company and the Construction company were allowed to take possession of the right of way and spend their money in the building of the road, and The Home National Bank to furnish its money on the security of the railroad bonds.

During all this time appellee made no protest or claim of any vendor's lien.

It would be inequitable now to allow them to set up such a claim.

It is insisted that, as the right of way deeds were not of record, the appellants purchased the railroad bonds at their own peril; but even if this be so, the appellants would only be held to notice of what they might have learned upon diligent inquiry, and an inquiry would only have resulted in

ascertaining the facts as they actually existed at the time, and that would not defeat the attaching of the railroad mortgage or trust deed to the right of way.

We find these facts from the evidence :   That it was the actual intention of appellees, at the time their contract and supplemental contract were made, to furnish the money and procure the right of way and place it in subordination to the lien of the first mortgage bonds; and it was their intention to accept the obligation of the Construction company for their security, and to not hold any lien on the right of way as against the mortgage.

They can not, therefore, be allowed to interpose any claim for a vendor's lien against the holder of the mortgage bonds actually issued.

Their claim for the money advanced for the right of way and expenses must be regarded as an unsecured claim as against the mortgage sought to be foreclosed in this suit, and such claim is not entitled to be paid out of the proceeds of the sale to be made under a decree for the payment of the mortgage bonds in question.

If any surplus should remain after paying the mortgage bonds and costs of foreclosure and sale, such surplus will remain in court to be distributed, according to equity and justice, to the parties entitled to it.

For the errors above noted in the decree, allowing appellees to share in the payment of their claim for right of way, disbursements out of the proceeds of the sale ordered in the decree, and not holding the mortgage bonds a paramount lien to all others, the decree of the court below is reversed and the cause remanded, with direction from this court to the Circuit Court to render a decree in accordance with this opinion, and to reject the claim of appellees for reimbursement out of the proceeds arising from the sale to be ordered for the payment of the first mortgage railroad bonds.